**Mayme McCORMICK, Respondent,**

v.

**ST. LOUIS UNIVERSITY, INC., Appellant.**

No. 74370.

Missouri Court of Appeals,
Eastern District,
Division Three.

May 4, 1999.

Motion for Rehearing and/or Transfer to Supreme Court Denied June 3, 1999.

Raymond R. Fournie, Ann E. Buckley, Armstrong Teasdale, St. Louis, for appellant.

Michael D. Stokes, Devereaux, Stokes & Nolan, P.C., St. Louis, for respondent.

PAUL J. SIMON, Presiding Judge.

St. Louis University, Inc. (defendant) appeals from an order of the Circuit Court of the City of St. Louis granting a new trial to Mayme McCormick (plaintiff) following the jury's verdict, which was signed by nine jurors, in favor of defendant on plaintiff's claim of medical malpractice.

On appeal, defendant contends that the trial court erred in granting plaintiff's motion for new trial (1) on the ground that one of the jurors "was unable to

make a cognizant decision on the evidence" due to "frequent lapses of consciousness" because nothing in the record indicates that the juror dozed at any time following an incident during plaintiff's opening statement; furthermore, by failing to request the juror's removal, plaintiff waived any objection; and (2) because plaintiff failed to present a submissible case against defendant in that no substantial evidence existed to support plaintiff's theory that surgeons failed to make fixed-point measurements. We reverse and remand with directions.

The record includes a transcript of more than 900 pages covering six days of trial. Although we have reviewed the record in its entirety, our recital of the facts will focus on the first point on appeal, which we find to be dispositive.

On November 30, 1992, Drs. Thomas Otto and Dennis Crandall, employees of defendant, performed surgery on plaintiff to replace her right hip. In early December 1992, she complained that her right leg seemed longer than her other leg. She visited Dr. Otto in mid-January 1993, at which time he believed that she might have pelvic tilt. He ordered a scanogram and found a two millimeter difference in the length of her legs. In mid-February 1993, Dr. Kenneth Burkus examined plaintiff and diagnosed pelvic obliquity or tilt of unknown etiology and adult scoliosis. He measured the length of her legs and found a difference of approximately one centimeter. Near the end of March 1993, still feeling some pain near the area of her right hip, she saw Dr. Michael Winer, who also found a difference of about one centimeter. Dr. Winer recommended that she see Dr. Leo Whiteside to address her complaints of continued pain.

Dr. Whiteside first examined her in early April 1993. He performed an examination and found her right leg to be one to one and one-quarter inches longer than the left one. An x-ray later would show the difference to be approximately one centimeter. He referred her to a pain clinic, where doctors ruled out reflex sympathetic dystrophy and recommended that she return to Dr. Whiteside to determine whether surgery would be in order. Dr. Whiteside found that the original hip replacement was performed correctly but that somehow her pelvis had tilted to the right, making her right leg appear to be longer. He agreed to perform revision surgery in mid-May 1993. Thereafter, she returned to the pain clinic to help her deal with continuing discomfort.

On November 15, 1994, plaintiff filed her petition against defendant and Drs. Otto and Crandall. In pertinent part, she alleged that on November 30, 1992, Drs. Otto and Crandall, agents of defendant, acted negligently by failing to reestablish the appropriate length of her leg between her pelvis and femur; as a result, her right leg was rendered one and one-quarter inch longer than her left leg, causing her to undergo additional surgery, hospitalization, and medical care, incur additional medical expenses including expenses for physical therapy, and suffer much pain and limitation of function in her right hip, right leg, and lower back. Defendant and Drs. Otto and Crandall answered by denying her allegations. On May 21, 1997, plaintiff dismissed her claim against Drs. Otto and Crandall and proceeded against defendant on a theory that "the surgeons failed to perform fixed-point measurements to maintain leg length equality during the surgery of November 30, 1992."

Trial commenced on the morning of March 2, 1998. At the conclusion of plaintiff's *voir dire*, defendant moved to strike some of the panel members for cause. In particular, defendant mentioned venireperson Terry Raff, as follows:

[Defendant's attorney]: Next one is — though I am not sure. L. Terry Raff, kind of been dozing off through most of the proceedings here. I am not sure if he's going to be able to stay awake during the trial.

THE COURT: I'll pay attention to him more....

* * *

Prior to this point, Raff is mentioned only once in the transcript, when he engaged in a very brief dialogue with plaintiff's attorney regarding Raff's employment. Nothing in the record indicates that Raff slept or dozed prior to the time when defendant mentioned him.

At the conclusion of defendant's *voir dire*, the trial court offered plaintiff and defendant an opportunity to make additional "cause strikes." After plaintiff moved to strike one of the panel members for cause, defendant again mentioned Raff, as follows:

[Defendant's attorney]: Judge, I am just not sure. Although I think Mr. Raff, who is the last juror on page one —

THE COURT: I was looking. I didn't see him dozing.

[Defendant's attorney]: I think it was because of my personality rather than [plaintiff's attorney's].

THE COURT: It could be....

* * *

Raff remained on the panel and became a member of the jury. Nothing in the record indicates that Raff slept or dozed before defendant mentioned him to the trial court a second time. In fact, at the conclusion of *voir dire*, the trial court commended the venire for its attention as follows: "Ladies and gentlemen, your participation was very much appreciated. You are very alert in responding to the questions. So much so that perhaps we are a little behind where we normally are. But that's to your credit, not to your detriment, because it shows that you care." Twelve jurors and one alternate then were seated.

On the morning of the second day of trial, in the middle of plaintiff's opening statement to the jury, the trial court interrupted plaintiff's attorney as follows:

THE COURT: Excuse me just a minute. Mr. Raff. Mr. Raff, are you all right?

JUROR NO. 538 (Terry L. Raff) Yes.

THE COURT: Would you like — would you like a Life Saver or something like that? Would that help you, a little candy or something like that?

JUROR NO. 538 (Terry L. Raff) Oh, no thank you.

THE COURT: Are you having a little trouble staying with us? Are you in some distress or anything?

JUROR NO. 538 (Terry L. Raff) Oh, no.

THE COURT: Okay. Would you like me to pass up one of these? Do you have a favorite color? Can you stay with us?

JUROR NO. 538 (Terry L. Raff) Yeah.

THE COURT: Thank you. Go right ahead. I use — I use Life Savers occasionally if I find myself — particularly after lunchtime. You know, it's only fair after lunchtime to get a little to the point of drowsiness. And I don't want anyone to hesitate, if you want to keep a pack of these in your purse or pocket, why I don't take offense at you using them. Okay? Go right ahead Mr. Stokes. I do apologize.

* * *

This reference to Raff during plaintiff's opening statement on the morning of the second day of trial appears at pages 192 and 193 of the 924-page transcript. A careful review of the transcript reveals that, thereafter, juror Raff was not mentioned again. On the morning of the fourth day of trial, the trial court dismissed the alternate juror for personal reasons related to her employment and continued the trial with the jury of twelve.

During the trial, plaintiff presented her testimony as well as that of Dr. Otto, Dr.

Ronald B. Greene, an expert witness, and her daughter. Additionally, plaintiff submitted over thirty exhibits, played the video deposition of Dr. Winer, and read from the deposition of Dr. Barry Feinberg, who treated her at the pain clinic. At the close of plaintiff's evidence, defendant submitted a motion for directed verdict, which the trial court denied.

Defendant presented the testimony of Dr. John Kinney, an employee of defendant who saw plaintiff before and after her initial surgery, Laura Normington, a physical therapist who worked for defendant at the time of plaintiff's initial surgery and assisted plaintiff following that surgery, and Dr. Otto. Additionally, defendant submitted approximately twenty exhibits, read from the depositions of Drs. Crandall, Burkus, and Feinberg, and played the video deposition of Dr. Whiteside. At the close of all the evidence, the defendant submitted another motion for directed verdict, which the trial court denied.

The trial court held an instruction conference, read instructions to the jury, and allowed the parties to present their arguments to the jury, which returned a verdict signed by nine jurors in favor of defendant. After the jury returned its verdict, the trial court asked the parties if they wanted to present any motions. Neither party did so. The trial court also invited the parties to examine the verdict and thanked the jury for its attentiveness as follows: "Ladies and gentlemen, I want to thank you for your thoughtful attention to this case and for the time that you spent with us these last days. You have been a very professional jury and we very much respect that.... And most particularly we thank you for your faithful participation. We will stand adjourned now."

On April 2, 1998, plaintiff filed her motion for new trial on two grounds, only one of which relates to the first point on appeal. In its entirety, the relevant allegation reads as follows:

1. Juror # 538 slept through different intervals of the trial, including the presentation of evidence. The juror was not removed from the panel, and the Plaintiff was thereby prejudiced.

The Court noted the juror sleeping on several occasions and questioned him in open court. The Court offered him candy and the sheriff, on several occasions, gave him a glass of water in an attempt to prevent his dozing.

The sole alternate in this case had been dismissed for health/emotional reasons. The Court had no alternate to replace juror # 538.

The Plaintiff was prejudiced because juror # 538 was inattentive during much of the presentation of the evidence, was not able to effectively discharge his duties, and went along with the majority of the jurors during deliberation. Only nine jurors signed the verdict form; juror # 538 was one of the nine. Juror # 538 did not hear or see much of the evidence, therefore, manifest injustice or miscarriage of justice has resulted.

Defendant filed suggestions in opposition to plaintiff's motion for new trial, noting that (1) plaintiff did not move to strike the juror; (2) the trial court indicated that it would "keep an eye on" the juror; (3) the trial court did so; and (4) the juror was able to continue serving on the jury during the trial.

On April 23, 1998, without a hearing, the trial court granted plaintiff's motion for new trial as follows:

Parties, by phone to clerk, indicate post-trial motion for new trial may be submitted this date for ruling without further argument.

Motion for new trial is hereby submitted. Upon due consideration of issues raised therein, the Court finds substantial justice requires a new trial of the issues for the reason that Juror Terry Raff seated in # 4 seat (# 538) whose participation in signing the verdict as one of nine (three not in agreement)

resulted in an end of deliberations, was unable to make a cognizant decision on the evidence—occasioned by his frequent lapses of consciousness. Were there ten jurors in agreement the Court might not be inclined to order a new trial, but in the event here a verdict is, in the Court's considered opinion, a nullity which bears only eight (8) conscious jurors' signatures and one (1) signature of an unconscious fact finder.

New Trial Granted — Return to Div. 1

Defendant filed its notice of appeal on May 4, 1998.

In its first point on appeal, defendant contends that the trial court erred in granting plaintiff's motion for new trial on the ground that one of the jurors "was unable to make a cognizant decision on the evidence" due to "frequent lapses of consciousness" because nothing in the record indicates that the juror dozed at any time following an incident during plaintiff's opening statement; furthermore, by failing to request the juror's removal, plaintiff waived any objection.

In reviewing the trial court's grant of a new trial, we are to indulge every reasonable inference in favor of the trial court and may not reverse unless there has been a clear abuse of discretion. *Grant v. Estate of McReynolds*, 779 S.W.2d 246, 247 (Mo.App. E.D.1989). Factual assertions in the brief cannot supplement the transcript. The general rule is that we will not consider matters not contained in the record. The ruling of the trial court must be substantially supported by the record. *Id.*

Our Supreme Court considered the viability of an order granting a new trial based on juror dozing in *Yoon v. Consolidated Freightways, Inc.*, 726 S.W.2d 721 (Mo.banc 1987). There, a husband and wife filed an action for personal injury against a corporation and one of its employees after a truck driven by the employee struck husband. The jury returned a verdict in favor of husband and wife but

the trial court ordered a new trial on three grounds, one of which involved juror misconduct, specifically, "dozing off" during trial. *Id.* at 722.

In reviewing the trial court's order, our Supreme Court emphasized that a claim of juror misconduct based upon juror dozing during trial must be made known to the trial court at the time of trial and cannot be raised for the first time in a motion for new trial; furthermore, a trial court must find that the juror misconduct prejudiced a party before it may declare a mistrial or order a new trial. *Id.* at 722–23. In reviewing the record, the Court observed that during the afternoon recess on the third day of trial, defendants' attorney brought to the trial court's attention several jurors who "were sleeping, or at least had their eyes closed and gave the appearance of being sleeping for a substantial portion of the afternoon testimony." The attorney stated that the jurors' conduct was prejudicial due to the significance of the medical testimony presented during that period and moved for a mistrial. The trial judge noted that he too had observed several jurors with their eyes closed or their heads bobbing during the afternoon session, but denied defendants' in-trial motion, stating that he did not know if they actually were sleeping and that he would reconsider the charge if preserved in a motion for a new trial. *Id.* at 722. Because defendants made a timely objection to the jurors' dozing, and because the record showed that the trial court had observed jurors with their eyes closed or their heads bobbing, the Court held that the record did not demonstrate that the trial court abused its discretion in finding that several jurors dozed during the trial. *Id.* at 723.

Here, the record reveals that, throughout the six-day trial, plaintiff never objected to or made a record as to Raff's alleged dozing. When defendant's attorney first mentioned Raff to the trial court during *voir dire*, the trial judge stated that he

would "pay attention to him more." When defendant's attorney mentioned Raff to the trial court a second time during *voir dire*, the trial judge stated, "I was looking. I didn't see him dozing." The trial judge thereafter commended the venire for its alertness and care. Later, when the trial judge interrupted plaintiff's attorney during his opening statement, he asked Raff if he was all right, if he was in distress, or if he wanted a Life Saver. No mention of Raff appears in the record following the trial court's offer of the Life Saver. Two days later, when the trial court dismissed the only alternate juror, neither party expressed any concern about Raff's alertness or his continued presence on the jury. After the jury rendered its verdict, neither party offered any motions when offered an opportunity to do so. Then following the verdict, the trial court commended the jury for its attentiveness and participation.

Here a review of the record indicates that plaintiff, unlike the defendants in *Yoon*, failed to make known to the trial court the juror dozing. Although plaintiff alleged that Raff dozed in her motion for new trial, a claim of juror misconduct based upon juror dozing must be made known to the trial court at the time of trial and cannot be raised for the first time in a motion for new trial. *Id.* at 722–23. Although appellate courts should be more liberal in upholding a grant of a new trial than in awarding a new trial when the trial court denies one, *Id.* at 723, here the record fails to indicate a basis to support the trial court's order. Plaintiff participates in a six day trial and the release of the alternate juror and then upon the return of an adverse verdict, raises an issue as to a juror dozing during trial in her motion for new trial. Upon return of the verdict, the trial court asked counsel if there were any motions and there was none from plaintiff. The jury was discharged. Plaintiff's counsel's action is a classic example of "sandbagging" and a waste of precious administration of justice time and effort. Defendant's point is meritorious. We need not review its remaining point on appeal.

Judgment reversed and remanded with directions to reinstate the jury's verdict.

KATHIANNE KNAUP CRANE, J. and LAWRENCE E. MOONEY, J., concur.